**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**EASTERN DIVISION**

**NANCY HALL,** on behalf of
herself and all others similarly situated,

                Plaintiff,

v.

**THE FIRST BANCSHARES, INC.,**

                Defendant.

_____/

JURY TRIAL DEMAND

CLASS ACTION

Case No. __2:23-cv-192__-KS-MTP

## CLASS ACTION COMPLAINT

Plaintiff, Nancy Hall, on behalf of herself and all others similarly situated, brings this Class Action Complaint against Defendant, The First Bancshares, Inc. ("Defendant"), and alleges as follows:

### Introduction

1.      Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals ("Class") against Defendant over (1) the improper assessment and collection of overdraft fees ("OD Fees") on debit card transactions that were authorized on sufficient funds, and (2) violation of Regulation E of the Electronic Fund Transfer Act, 12 C.F.R. § 1005.17.

2.      Defendant's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation of Defendant's contractual commitments.

3.      Plaintiff, on behalf of herself and a class of similarly situated consumers, seeks to end Defendant's abusive and predatory practices and force it to refund all of these improper charges. Plaintiff asserts a claim for breach of contract, including breach of the covenant of good

faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below. Further, Plaintiff alleges that Defendant is unjustly enriched by these wrongful practices.

4.      Plaintiff also alleges that because Defendant provided inaccurate and untruthful overdraft information to Plaintiff and the Class regarding its overdraft practices, Defendant violated Regulation E of the Electronic Funds Transfer Act, 12 C.F.R. § 1005.

5.      Through the imposition of these fees, Defendant has made substantial revenue to the tune of millions of dollars, seeking to turn its customers' financial struggles into revenue. Unfortunately, Plaintiff, like thousands of others, has fallen victim to Defendant's fee revenue maximization schemes.

6.      Plaintiff, on behalf of herself and a class of similarly situated consumers, seeks to end Defendant's abusive and predatory practices and force it to refund all of these improper charges.

## PARTIES

7.      Plaintiff is a citizen and resident of Waycross, Georgia and has maintained a checking account with The Heritage Bank at all times relevant hereto.

8.      Defendant, The First Bancshares, Inc. is the parent company of The First Bank. Defendant is a bank with more than $7.8 billion in assets, with its principal place of business and headquarters located at 6480 U.S. Highway 98 W, Hattiesburg, Mississippi 39402.

9.      Defendant acquired Heritage Southeast Bancorporation, Inc. ("HSBI") in or around January 2023.[1] Following the acquisition, HSBI's subsidiary bank, Heritage Southeast Bank was

---

[1] Press Release, The First, The First Bancshares, Inc. Completes Acquisition of Heritage Southeast Bancorporation, Inc. (January 3, 2023), https://thefirstbancshares.q4ir.com/presentations-and-press-releases/news-details/2023/The-First-Bancshares-Inc.-Completes-Acquisition-of-Heritage-Southeast-Bancorporation-Inc/default.aspx.

merged with The First Bank, with The First Bank as the surviving bank. The Heritage Bank was a division of Heritage Southeast Bank and was also merged with The First Bank.

10.     Defendant is the successor in interest to HSBI and The Heritage Bank.

## JURISDICTION AND VENUE

11.     This action arises under the laws of the United States, specifically 12 C.F.R. § 1005.17, *et seq*. This action also arises under the laws of the State of Mississippi.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

13.     Jurisdiction is also proper pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d) because: 1) the claims of the proposed Class, when aggregated together, exceed $5,000,000, and 2) some putative members of the Class are residents of different states than Defendant, including Plaintiff.

14.     This Court has personal jurisdiction over this action because the Defendant is incorporated and headquartered in this State.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is headquartered and does business in this District.

## BACKGROUND FACTS

16.     Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *Overdraft Revenue Inches Up in 2018*, https://bit.ly/3cbHNKV.

17.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were

more likely to be assessed OD Fees. *Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts* 8 (June 2014), https://bit.ly/3ksKD0I.

18.     Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

19.     In line with this industry trend, the New York Attorney General recently asked other industry-leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

20.     Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.     DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.  Overview of the Claim

21.     Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what is referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

22.     Here is how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available

balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

23.     However, Defendant still assesses crippling OD Fees on many of these transactions and misrepresents its practices in the Contract.

24.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

25.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

26.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

27.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to

account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

28.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

29.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They, therefore, could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to disclosing overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

30.     The CFPB has also stated:

Consumers are likely to reasonably expect that a transaction that is authorized at point of sale with sufficient funds will not later incur overdraft fees. Consumers may understand their account balance based on keeping track of their expenditures, or increasingly through the use of mobile and online banking, where debit card transactions are immediately reflected in mobile and online banking balances. Consumers may reasonably assume that when they have sufficient available balance in their account at the time they entered into the transaction, they will not incur overdraft fees for that transaction. But consumers generally cannot reasonably be expected to understand and thereby conduct their transactions to account for the delay between authorization and settlement—a delay that is generally not of the consumers' own making but is the product of payment systems. Nor can consumers control the methods by which the financial institution will settle other transactions—both transactions that precede and that follow the current one—in terms of the balance calculation and ordering processes that the financial institution uses, or the methods by which prior deposits will be taken into account for overdraft fee purposes.

Consumer Financial Protection Bureau, "Circular 2022-06" (June 2022).

31.     The CFPB has even called out APSN transactions specifically as "unanticipated:"

Unanticipated overdraft fees can occur on "authorize positive, settle negative" or APSN transactions, when financial institutions assess an overdraft fee for a debit card transaction where the consumer had sufficient available balance in their account to cover the transaction at the time the consumer initiated the transaction and the financial institution authorized it, but due to intervening authorizations, settlement of other transactions (including the ordering in which transactions are settled), or other complex processes, the financial institution determined that the consumer's balance was insufficient at the time of settlement. These unanticipated overdraft fees are assessed on consumers who are opted into overdraft coverage for one-time debit card and ATM transactions, but they likely did not expect overdraft fees for these transactions.

*Id.*

32.     Furthermore, the CFPB has found that consumers could not reasonably avoid

"substantial injury, irrespective of account-opening disclosures.," stating:

While work is ongoing, at this early stage, Supervision has already identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers. Supervision found instances in which institutions assessed unfair APSN overdraft fees using the consumer's available balance for fee decisioning, as well as unfair

APSN overdraft fees using the consumer's ledger balance for fee decisioning. **Consumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures**. As a result of examiner findings, the institutions were directed to cease charging APSN overdraft fees and to conduct lookbacks and issue remediation to consumers who were assessed these fees.

Consumer Financial Protection Bureau, "Supervisory Highlights Junk Fees Special Edition" (March 2023).

33.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. However, Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

34.     Nevertheless, Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

35.     Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**A. Mechanics of a Debit Card Transaction**

36.     A debit card transaction occurs in two parts. First, the merchant instantaneously obtains authorization for the purchase amount from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

37.    At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the transaction amount but does not yet transfer the funds to the merchant.

38.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

39.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry-wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

40.    There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**B.  Defendant's Contract**

41.    Plaintiff had a Defendant checking account at all times material hereto governed by the contract and overdraft consent form (together the "Account Documents").

42.    Defendant provided an overdraft consent form ("OD Opt-In Form") to Plaintiff at the time the account was opened. The form, titled "What You Need to Know about Overdrafts and Overdraft Fees", is attached to this Complaint as Exhibit A.

43.    The OD Opt-In Form states:

An **overdraft** occurs when you do not have enough money in your checking account to cover a transaction, but we pay it anyway.

Ex. B.

44.    In breach of this promise, Defendant assesses OD Fees on debit card transactions when there was enough balance in Plaintiff's checking account to cover a transaction.

45.    For debit card transactions, Defendant also expressly links "authorization" to "payment," which is when Plaintiff pays the merchant:

**What are the standard overdraft practices that come with the account?**

We do ***authorize and pay*** overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We will not ***authorize and pay*** overdrafts for the following types of transactions unless you ask us to:

- ATM Transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always ***authorize and pay*** any type of transaction.

If we do not ***authorize and pay*** an overdraft, your transaction will be declined.

**What fees will I be charged if The Heritage Bank, a Division of Heritage Southeast Bank pays my overdraft?**

Under our standard overdraft procedures:
- We will charge you a fee of **$35** each time we pay an overdraft
- There is a 4 per day limit on the total fees we can charge you for overdrawing your account

**What if I want The Heritage Bank, a Division of Heritage Southeast Bank to *authorize and pay* overdrafts on my ATM and everyday debit card transactions?**

If you also want us to ***authorize and pay*** overdrafts on ATM and everyday debit card transactions, call our Client Care Line at 800.624.6452 (Mon-Fri 8:00 am to 5:00 pm). You may also complete the form below and present it at your neighborhood branch of The Heritage Bank, a Division of Heritage Southeast Bank or you may mail it to us.

Please check one and return the entire form:
___ I do not want The Heritage Bank, a Division of Heritage Southeast Bank to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

___ I want The Heritage Bank, a Division of Heritage Southeast Bank to ***authorize and pay*** overdrafts on my ATM and everyday debit card transactions.

Ex. A (emphasis added and removed).

46.     Defendant uses the term ***authorize and pay*** eight (8) times in its OD Opt-In Form.

47.     Upon information and belief, Defendant also promises that it will place holds on funds at the time of authorization of a debit card transaction, which is when Plaintiff pays the merchant, and that these holds reduce the account's available balance.

48.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

49.     The above promises indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. But, of course, that is not true for APSN Transactions.

50.     In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

51.     The above representations and contractual promises are untrue. Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive

balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

52.     First and most fundamentally, Defendant charges OD Fees on debit card transactions for which sufficient funds are available to cover throughout their lifecycle.

53.     Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the OD Consent Form causes consumers like Plaintiff to incur more OD Fees than they should.

54.     Next, sufficient funds for APSN Transactions are immediately debited from the account, consistent with standard industry practice.

55.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. However, that is what Defendant does when it re-debits the account during a secret batch posting process.

56.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of a transaction of authorization and later at the time of settlement.

57.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

58.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the

transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

59.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

60.     In sum, there is a huge gap between Defendant's practices as described in the Account Documents and Defendant's actual practices.

61.     Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

62.     Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

63.     For example, Canvas Credit Union states:

Available balance **at the time transactions are posted (not when they are authorized)** may be used to determine when your account is overdrawn. The following example illustrates how this works:

Assume your actual and available balance are both $100, and you swipe your debit card at a restaurant for $60. As a result, your available balance will be reduced by $60 so your available balance is only $40. Your actual balance is still $100. Before the restaurants charge is sent to us for posting, a check that you wrote for $50 clears. Because you have only $40 available. . . . your account will be overdrawn by $10, even though your actual balance was $100 before the check posted. . . Also, when the $60 restaurant charge is presented to the Canvas and posted to your account, you will not have enough money in your available balance because of the intervening check, and you will be charged a fee for that transaction as well, even though your available balance was positive when it was authorized.

*Member Service Agreement, Part 2*, Canvas Credit Union 30 (Nov. 5, 2019), https://bit.ly/3kX0iXo (emphasis in original).

64.     Defendant and its accountholders make no such agreement.

**C. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

65.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

66.     Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

67.     Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they do not allow debt like credit cards as the money comes directly out of the checking account.

68.     Consumer Action, a national nonprofit consumer education, and advocacy organization, advises consumers in determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card, you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

69.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years. With that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their

wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

70.     Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash permanently and irreversibly.

71.     Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

72.     In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

73.     Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

74.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

75.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this widespread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

76.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

77.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

78.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

**D. Plaintiff Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds**

79.     In support of her claim, Plaintiff offers examples of fees that should not have been assessed against her checking account.

80.     On or around February 25, 2020, Plaintiff was assessed a $35 OD Fee on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

81.     On or around July 20, 2020, Plaintiff was assessed a $35 OD Fee on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

82.     On or around October 14, 2020, Plaintiff was assessed a $35 OD Fee on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

83.     On or around November 3, 2020, Plaintiff was assessed a $35 OD Fee on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

84.     On or around November 10, 2020, Plaintiff was assessed a $35 OD Fee on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

85.     On or around September 3, 2021, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

86.     On or around October 4, 2021, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

87. On or around November 2, 2021, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

88. On or around November 12, 2021, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

89. On or around February 14, 2022, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

90. On or around May 20, 2022, Plaintiff was assessed multiple $36 OD Fees on a debit card transaction that settled that day, even though the transaction had been previously authorized on sufficient funds.

91. Because Defendant had previously held the funds to cover these transactions, Plaintiff's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

## II.   DEFENDANT VIOLATED REGULATION E OF THE ELECTRONIC FUND TRANSFER ACT, 12 C.F.R. § 1005.17.

### A.  Regulation E Overview

92. The federal government has stepped in to provide additional protections to consumers with respect to abusive overdraft policies. In 2010, the Federal Reserve Board enacted a regulation permitting financial institutions to charge overdraft fees on ATM and one-time debit charges only if the institution first obtained the customer's affirmative consent. 12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").

93.     To qualify as affirmative consent, the opt-in notice/agreement must include, but is not limited to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft;

- The opt-in consent must be obtained separately from other consents and acknowledgments;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different items for the account depending on whether the customer opted into the overdraft program.

94.     If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of the Opt-In Rule, then it is not allowed to charge overdraft fees on ATM and one-time debit card transactions.

95.     At all relevant times, Defendant has had an overdraft program in place for assessing overdraft fees on ATM and debit card transactions, which is: (1) contrary to the express terms of its contracts with its members; (2) contrary to how Defendant represents its overdraft program to its members; and (3) contrary to what members expect when assessed overdraft fees.

96.     As alleged herein, Defendant assesses fees when an account is not "overdrawn."

97.     This practice is in breach of Defendant's Account Documents, including its OD Opt-In Form. Additionally, the practice of charging overdraft fees even when there is sufficient money in the account to cover the transaction is inconsistent with how Defendant describes the circumstances when it assesses overdraft fees in other customer materials.

98.     Further, Defendant has failed to inform customers of the true conditions under which OD Fees will be assessed in both its Contract and other marketing materials, as alleged herein.

### III.     NONE OF THESE FEES WERE ERRORS.

99.     The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant but rather were intentional charges made by Defendant as part of its standard processing of transactions.

100.    Plaintiff, therefore, had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

101.    Moreover, any such reporting would have been futile as Defendant's own Account Documents admit that Defendant decided to charge the fees.

### IV.     THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

102.    Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

103.    Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. However, instead of exercising that discretion in good faith and consistent with

consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

104.    Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

105.    It was bad faith and totally outside Plaintiff's reasonable expectations for Defendant to use its discretion in this way.

106.    When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its contractual discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ALLEGATIONS

107.    Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following Class.

108.    The proposed Class are defined as:

The Class: All Defendant checking accountholders who, during the applicable statute of limitations, were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

109.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

110.    Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, directors, legal representatives, successors, and assigns; any entity in which Defendant has a controlling interest; all customers members who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

111.    The members of the Class are so numerous that joinder is impractical. The Class consist of thousands of members, whose identities are within the exclusive knowledge of Defendant and can be ascertained only by resorting to Defendant's records.

112.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all members of the Class, was charged improper fees. Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct in that they have been assessed unlawful fees. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of deceptive and unlawful conduct resulting in injury to all members of the Class. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Class.

113.    The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Class.

114.    Among the questions of law and fact common to the Class include:

    a.    Whether Defendant violated its Account Documents by charging fees OD Fees on APSN Transactions;

    b.    Whether Defendant had standardized Opt-In Agreements during the Class period that were provided to its customers;

c.      Whether Defendant's conduct breached the OD Opt-In Form;

d.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17;

e.      Whether Defendant breached its covenant of good faith and fair dealing with Plaintiff and other members of the Class through its fee policies and practices;

f.      The proper method or methods by which to measure damages; and

g.      The declaratory and injunctive relief to which the Class are entitled.

115.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses, and Defendant's misconduct will proceed without remedy.

116.    Even if Class members could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

117.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

118. Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Class, is at risk of additional improper fees. Plaintiff and the Class are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its illegal actions.

## CAUSE OF ACTION ONE

**Breach of Contract, Including Breach of the Covenant of Good Faith and Fair Dealing**
**(*On Behalf of Plaintiff and the Class*)**

119. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

120. Plaintiff and Defendant have contracted for bank account deposit, checking, ATM, and debit card services.

121. Defendant mischaracterized in the Account Documents its true overdraft practices and breached the express terms of the Account Documents.

122. No contract provision authorizes Defendant to charge OD Fees on APSN Transactions.

123. Under Mississippi law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers banking transactions.

124. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and

abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

125.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

126.    Defendant has breached the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

127.    Defendant harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

128.    Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them by the Account Documents.

129.    Plaintiff and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the covenant of good faith and fair dealing.

130.    Plaintiff and the members of the Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## CAUSE OF ACTION TWO
### VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT
*(On Behalf of Plaintiff and the Class)*

131.    Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

132.    Regulation E may be enforced through a private right of action, *See Hinton v. Atl. Union Bank*, No. 3:20CV651, 2020 WL 9348205 (E.D. Va. Nov. 2, 2020); *see also Lussoro v. Ocean Fin. Fed. Credit Union*, 456 F. Supp. 3d 474, 495 (E.D.N.Y. 2020).

133.    By charging overdraft fees on APSN transactions, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq*.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 *et seq*.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

134.    Specifically, the charges violated what is known as the "Opt-In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt-In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id*.) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).) To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

135.    The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's

overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

136.     Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 1005.17 because it misrepresents Defendant's overdraft practices, as discussed above.

137.     Plaintiff relied on Defendant's misrepresentations in its OD Opt-In Form. Plaintiff chose to opt-in to overdraft protection based in part on Defendant's misrepresentations regarding its overdraft program.

138.     As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Class.

139.     Due to Defendant's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

### CAUSE OF ACTION THREE
**Unjust Enrichment**
*(On Behalf of Plaintiff and the Class)*

140.     Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

141.    Plaintiff, individually and on behalf of the Class, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's breach of contract claim and applies only if the parties' contract is deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

142.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly assessed fees upon Plaintiff and the members of the Class that are unfair, unconscionable, and oppressive.

143.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiff and the members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiff and the members of the Class.

144.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the members of the Class.

145.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

146.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to retain the benefits it received, and is still receiving, without justification, from the imposition of OD Fees on APSN Transactions on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

147.    The financial benefits derived by Defendant rightfully belong to Plaintiff and the members of the Class. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds collected by Defendant.

A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendant traceable to Plaintiff and the members of the Class.

148.    Plaintiff and the members of the Class have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class, respectfully requests the Court to enter an Order:

a.    certifying the proposed Class, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as counsel for the Class;

b.    declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its contractual promises;

c.    enjoining Defendant from breaching its Account Documents;

d.    awarding Plaintiff and the Class restitution in an amount to be proven at trial;

e.    awarding actual damages in an amount according to proof;

f.    awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g.    awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h.    awarding such other relief as this Court deems just and proper.

### Jury Demand

Plaintiff, by counsel, demands a trial by jury.

Dated: December 7, 2023                    Respectfully submitted,


                                           */s/ Winston S. Hudson*
                                           Winston S. Hudson
                                           MS Bar No.: 106598
                                           **JOHNSON FIRM**

29

610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
winston@yourattorney.com

*Counsel for Plaintiff and the Proposed Class*